Ruth M. NOEL et al., Libellants,

v.

UNITED AIRCRAFT CORPORATION,
Respondent.

No. 1781.

United States District Court
D. Delaware.

July 9, 1963.

Murray M. Schwartz, Wilmington, Del., Stephen M. Feldman and Joseph G. Feldman, (of Feldman, Feldman & Feldman), Philadelphia, Pa., for libellants.

William Prickett, (of Prickett & Prickett), Wilmington, Del., for respondent.

LAYTON, District Judge.

On June 20, 1956, at 3:18 A.M., a Super Constellation Airplane (hereafter called AMS) owned by Linea Aeropostal Venezolana (hereafter called LAV), a Venezuelan airline, left Idlewild Airport on a non-stop flight to Maiquetia, Venezuela. Aboard was a full complement of passengers and crew including several extra crewmen. At 4:30 A.M., AMS signaled Idlewild that it was returning to New York with Engine #2 "off." [1] At 5:29 A.M., with New York in sight, AMS wired for and received permission to dump fuel. After several seconds, it burst into an orange ball of fire, veered sharply to the right, descended, appeared to gain altitude and then nosed over and dove, exploding upon impact with the sea. The crash occurred about 30 miles off Asbury Park, New Jersey.[2] All aboard including libellants' testate, Mr. Noel, were lost. This negligence action [3] in Admiralty based upon the Death on the High Seas Act (46 U.S.C.A. § 761 et seq.) followed.

## LIBELLANTS' THEORY

According to libellants' theory, the accident happened in this fashion. Shortly before 4:24 A.M., an overspeed developed in the #2 engine. That is to say, the propeller was turning at a rate

---

[1]. The #2 engine is the left-hand, inboard engine as one faces forward in the aircraft.

[2]. The plane was never located. Shortly after the crash the Venezuelan government ordered the search discontinued and directed its investigators to pack up all papers and return. The Civil Aeronautics Board made no independent investigation, apparently upon the theory that AMS flew the Venezuelan flag and crashed upon the high seas outside its jurisdiction.

[3]. Counts based upon implied warranty were stricken in a previous opinion. D.C., 204 F.Supp. 929.

beyond the maximum for which it was designed to rotate.[4] The pilot was unable to feather [5] the propeller and elected to return to New York. Libellants further assert that the severe strain, due to the windmilling propeller, upon the turbine and other component engine parts resulted in a disintegration of the engine parts. This was followed by a decoupling which left the propeller and shaft windmilling at high speed completely independent of the engine from which the propeller shaft had decoupled. All this disintegration of parts built up a terrific heat and fire inside the engine which could not have been seen because of the very tight fit of the engine cowling over the engine. At about this time, say libellants, the pilot had received permission to dump fuel. Just after the fuel dump chutes were opened, the propeller completely separated from the engine, wobbled off in a right-hand direction, whirling and cutting through the left-hand side of the fuselage at about the # 4 seat position, severing all controls and cutting completely through part of seat #4. This separation released the hot gasses and fire inside the engine, resulting in a magnesium fire on the engine cone. The flames and hot gasses from this fire were swept back over the wing of AMS in a fraction of a second into the plumes of gasoline being released from the tanks, causing a ball of fire, subsequent explosion and the crash of the plane.

As an alternative theory, or perhaps simultaneously, libellants say the #2 propeller which cut through the seat also cut through the floor immediately below the seat and into a "belly" tank of gasoline just below the floor. This tank was nearly empty and, thus, full of dangerous fumes. The gashing of this metal tank by the metal propeller admitted air into the fumes and at the same time created sparks which exploded the tank and set fire to the gas plumes as well as the tank itself.

It should be observed at this point that the case at bar is not against LAV, the airline, or Lockheed, the manufacturer of the plane, but, rather, against United Aircraft Corporation (Hamilton Standard Division, hereafter called United), the manufacturer of the propellers, upon the following theories:

(1) That United failed to use due care in not sooner designing and developing safety devices which would either limit uncontrolled overspeeds or insure a means of feathering following an uncontrolled overspeed.

(2) In the alternative, that United failed to warn LAV of the danger of an overspeeding propeller and, thus, the desirability of having certain allegedly available safety devices.

In summary, libellants contend that no matter what actually took place after the initial overspeed, it was the overspeed and inability to feather which set in motion the events culminating in the loss of AMS, and but for which the accident would never have happened.

## RESPONDENT'S DEFENSES

United defends on several grounds. First, while admitting the possibility that the accident happened as charged, it contends that libellants fell far short of proving it by a preponderance of the evidence. Second, it takes the position

4. This overspeed, say libellants, was the probable result of the sticking of a valve in the 5U18 governor of #2 propeller due to contamination in the oil. However, the reason is relatively unimportant because libellants argue that since overspeeds, regardless of cause, are very dangerous unless the propeller can be feathered, and since United knew of the long history of overspeeds together with inability to feather its propellers, it was

United's duty to have developed earlier some form of overspeed control or separate feathering device.

5. To feather means to cause the propeller blades to be turned to a position parallel to the airstream so that they will cease to rotate due to pressure of air across the blades. Inability to feather permits the overspeeding propeller to rotate at an uncontrolled speed.

that no one knows just how the accident happened and that libellants' version is but one of a number of possibilities including,

(1) Gasoline leakage in the starboard wing followed by an explosion blowing off the wing.

(2) An unexplained fire on the starboard side of the fuselage clearly observed by the personnel of the Coast Guard escort plane.

United, also, denies negligence on either of the grounds charged.

### DANGERS INHERENT IN OVERSPEEDS

Preliminary to any step by step analysis of the chronological occurrences preceding this accident, one must have some basic understanding of the dangers inherent in a prolonged engine overspeed followed by an inability to feather the propeller.

In general, the expert testimony for both sides agreed that any prolonged overspeed in excess of 3600 RPM (and probably less) is exceedingly dangerous because of the strong likelihood of disintegration of the engine and its component parts (LX 67), decoupling [6] and fire (RP 1825; 2929; 2548; 2176; 2177; Appendix).[7] Fire in flight is the greatest dread of an airline pilot. (RP 2924; 2927). A decoupling may be followed by a complete separation of the propeller,[8]

that is to say, following the decoupling, the propeller shaft (to which the propeller hub and blades are connected) being entirely disconnected from the engine permits the propeller to windmill at an uncontrolled speed merely because of the wind pressure across the blades. At this juncture, the propeller shaft may snap and the propeller hub and blades fly off or separate. (RP 1825; 2548).

Since the overspeed on AMS happened at about 19,000 ft. and lasted approximately fifty minutes, there is the strong probability that all of these dangerous conditions prevailed on AMS (LX 67). Even a layman can readily appreciate the critical danger resulting from a three-bladed propeller, 15 feet in diameter, attached to a heavy metal hub, suddenly whirling free of the plane at, say, 3000 R.P.M. The course the propeller will take is completely random (RP 3189). It may drop straight away and down as in the Cut Bank incident (LX 66);[9] or to the side, catching in the nacelle of the neighboring engine and doing no harm as in the Shannon incident (RX 30); or cut through the top of the fuselage itself as in the Memphis incident (LX 142).[10] However, one may imagine the terrifying consequences of a propeller separating and ripping directly through the fuselage into the cabin, in which case bodies would be mangled, controls and electrical wiring severed, a huge gash

6. The engine crankshaft is connected to the propeller shaft by a coupling so that the engine turns the propeller shaft. When these two shafts separate, this is a decoupling. (RP 440; 587).

7. Attached to this opinion marked Appendix is a list of overspeeds accompanied by inability to feather the propellers known to have happened between 1947 and 1959. There were unquestionably many more. (RP 2995; 2996) The Appendix consists in the main of libellants' Exhibits 77 and 78. This Appendix has a direct bearing on many phases of this case both fact and law. It should be noticed that incidents appearing in the Appendix after June 20, 1956, were not considered by the Court in arriving at its conclusions.

8.

| 7/7/49 | Pan American | LX 78 |
|---|---|---|
| 5/23/51 | Pan American | LX 78 |
| 12/31/54 | U. S. Navy | LX 87 |
| 3/26/55 | T.W.A. | LX 78 |
| 10/26/55 | Air Force | LX 91 |
| 12/28/55 | Pan American | LX 78 |
| 3/5/57 | American | LX 78 |
| 8/18/57 | Vareg | LX 91 |
| 10/30/57 | S.A.S. | LX 91 |
| 7/25/58 | T.W.A. | LX 91 |
| 11/9/59 | Air France | RX 30 |

9. In the Cut Bank emergency, the plane was on fire upon landing and two passengers were injured.

10. In the Memphis emergency, 5 passengers received injuries of varying degrees and all passengers suffered from the sudden decompression.

or hole made in the fuselage and possibly gas tanks penetrated and fired or exploded. Moreover, separation of the propeller will, in turn, permit air directly into the motor thus causing fire, if, in fact, there is not fire already caused by the intense heat due to the friction and disintegration of the motor. (RP 694; Appendix.)

Returning, for a moment, to the possibility of a decoupling in this case, there seems to be no real disagreement among the witnesses that a decoupling in fact took place. This arises from the fact that AMS reported its BMEP gauge and tachometer as reading zero while the propeller was still windmilling. Experts from both sides accepted this as meaning that the propeller had decoupled (RP 276; 674; 3187, LX 33).

## ANALYSIS OF LIBELLANTS' EVIDENCE

An analysis of the messages transmitted by AMS as well as other evidence convinces me that libellants have proved by a preponderance of the evidence that AMS developed an overspeed in the #2 engine at about 4:24 A.M., June 20, 1956, that the propeller could not be feathered and the pilot decided to return to New York. During the next fifty minutes there is fairly general agreement by both parties that AMS:

(1) Gradually reduced altitude.

(2) Gradually reduced speed.

(3) Sent a number of messages as to position, course, etc.

(4) Was advised by Capt. Mendoza, Chief Pilot of LAV, to clear passengers away from the immediate area of #2 propeller.

(5) Replied by saying this had already been considered and was impossible because the plane was full.

(6) Advised New York that it was proceeding at about 146 knots at an altitude of 9000–9500 ft.

It is also agreed that at 4:46 A.M., AMS signaled an emergency due to the overspeed and asked assistance.[11] As a result, Commander Hancox was ordered to take out a Coast Guard plane with a crew of four, including himself, to intercept and accompany AMS into Idlewild. At the same time, Captain Fisher in an Eastern Air Lines plane bound for Puerto Rico changed course to intercept. Thereafter, Commander Hancox sighted AMS by its lights and took up an escort position at first about 200, and later about 500 yards, off the port beam, slightly astern and 100 ft. above. Captain Fisher was also approaching. At 5:29, AMS radioed that it had New York in sight and, presumably because she was heavily laden with fuel, asked for and received permission to dump gasoline. Immediately thereafter, Captain Fisher noticed a "white puff" come out behind AMS, "then a very brief space and then a steady trail of mist which was coming out in a kind of a bubbling, rolling motion beneath the airplane, under the tail section and extending aft approximately the length of the fuselage —maybe not quite that far. *From my post with the moon reflecting on it, the mist had a silvery appearance * * *.*" (RX 39). (Emphasis supplied.) [12] This was, of course, the plumes of gasoline being released from the dump chutes.

A few seconds later, four seconds according to Fisher and seven seconds according to Hancox, AMS became a ball of flame. It veered sharply to the right, went into a shallow dive, appeared to gain altitude for a very short while and then dove over and fell into the sea, exploding upon impact. During the minute or so between the appearance of the

---

11. It is a possibility that at this juncture the #2 engine was making a very loud noise due to decoupling. (RP 2925). Later, there was a message indicating everything was under control again indicating the possibility that the noise in the engine had subsided after the decoupling, thus lulling the pilot into a false sense of security. This is speculation and not of first importance.

12. Commander Hancox thought he saw a blue flame. I think he was mistaken. I will consider his testimony hereafter.

orange ball of flame and the crash into the sea, several small objects were seen to fall free of the plane, and the radar man on the Coast Guard plane noticed on his radar scope that a piece or part, which Commander Hancox thought might have been a wing, split off from the main body of the plane.

The plane was never recovered. Next morning's search revealed only three significant finds—a double airplane seat and two bodies, each with a leg off.[13]

These bodies although badly mangled were in a relatively good state of preservation as compared with parts of other bodies seen floating near the wreckage. They were identified as a Mrs. DeArmis and her son who, according to the flight plan, had been assigned to seat #4 just back of the #2 propeller, the tips of which rotated only 13 inches clear of the skin of the fuselage. The outboard seat of the double seat had been cut completely through by some sharp descending object as in the diagram:

Significantly, this seat and the two DeArmis bodies were recovered three miles from the main scene of the wreckage. According to Gates (RX 39), Lockheed's expert and United's witness:

"This one seat, the only one recovered, had been cut from top to bottom by a downward, angular, smashing blow that went right through the seat left-hand arm rest, seat cushion and lower frame. *Paint marks and spacing of the marks on seat structure were visibly similar to the paint banding which is on propellers adjacent to the tips.* The cut was from *the left hand side*

and at the same angle at which the #2 propeller would hit if it tipped back around the cowling as it would if it came off while windmilling.

"* * * We checked and found that the #5 tank [a belly gas tank located immediately under the seat in which Mrs. DeArmis and her son were seated] was supposed to have minimum fuel in it at the time of the fire, only about 50 gallons, so we don't *quite know whether or not the propeller could have released enough fuel by chopping down into it to cause the general fire.*" (Emphasis supplied.) [14]

13. According to Dr. Halpern, both bodies had the right legs severed. According to the Coast Guard, the body of the boy had the left leg severed.

14. Gates also speculated that the cut in the seat could have been made by the

general break-up of the plane on impact with the sea, but he does not seem to have been aware of the highly significant fact that the seat and the two DeArmis bodies were found three miles from the main wreckage, indicating that they were

. Starting from the premise that the ball of fire was ignited by some source within the plane, it is libellants' position that just as AMS started to dump gas, the #2 propeller, then windmilling wildly and unattached to the engine, suddenly separated and flew off. Two things resulted simultaneously according to libellants:

(1) The fire within #2 motor caused by the decoupling burst out, or, the penetration of air into the intensely heated engine suddenly caused a magnesium fire to burst out on the nose cone. The flames from the engine fire were swept back into the gas plume from the left hand dump chute, igniting it.

(2) The propeller flew to the right and slightly back, slashed through the skin of the fuselage at about seat #4, cut completely through the left, or outboard, side of seat #4 on through the floor and into the belly tank of gas located immediately under the floor, in turn exploding it.[15]

The respondent sharply criticizes this theory as based on pure speculation. However, I find it persuasive for two reasons. (1) It seems to have been tacitly agreed that it could have happened but United took the position that there was not enough evidence to take the case out of the realm of mere speculation. (2) Reducing the thing to its simplest form, we know:

(a) There was a huge fire on AMS. (The ball of flame.)

(b) Fire is composed of two elements, a combustible source and a source of ignition.

(c) We know of two combustible sources—the gas in the #5 belly tank and the plumes of raw gas being dumped.

(d) We do not actually know the ignition source, but from all the evidence of the experts and an examination of the Appendix demonstrating the number of times fires have developed from overspeeds, there is more than a possibility that the ignition source here was an engine fire and, perhaps also, an explosion in the #5 tank caused by the propeller gashing into it and creating hot sparks because of the clashing of metal parts.

In any careful analysis of this happening, the mind is always thrown back to the salient fact that the seat and two DeArmis bodies were found three miles from the main scene of the wreckage.[16] Since the main scene of the wreckage simply had to be the approximate spot where AMS crashed into the sea, the inference is inescapable that the seat and bodies fell or were blown out of the plane prior to the crash.

There is no precise explanation how the seat and two bodies were ejected from the plane prior to the crash. The propeller no doubt would have opened a sizeable hole in the fuselage. Also, one of the blades whirling down on the seat in a clockwise motion (facing forward)

not in the plane when it crashed into the sea.

15. It should be stated here parenthetically that the separation of #2 propeller is not essential to libellants' case. There is ample evidence that #2 engine could have been on fire and, with deference to all experts, a hot engine fire in near proximity to plumes of dumping gas is a most highly dangerous circumstance.

16. Libellants insist the reason the right legs were severed from the DeArmis' bodies is because the propeller severed them when it cut through the outboard #4 seat. But this could not be because the propeller cut only through the outboard seat, not the aisle seat. Besides, why would the right legs and not the left legs have been cut off? There is the possibility that Mrs. DeArmis was sitting in the aisle seat holding her son in her lap and that neither leg was severed by the propeller but rather by sharks which had horribly mutilated some of the bodies. Shark teeth marks were found at the point where the leg of the DeArmis boy was severed. It must be said that the two missing legs confuse rather than add anything to libellants' theory.

may have broken the seat loose and literally "scooped" the seat and bodies out. Or the bodies and seat may have fallen to the left and out through the hole in the fuselage made by the propeller in much the same fashion that the passenger on the front seat of a car will fall to the left when the car makes a sharp right-hand turn. In this case, it will be remembered that the plane swerved sharply to the right. Or, again, the seat may have been blown out by an interior explosion.

Moreover, the seat itself gives the one main clue as to whether or not the propeller separated. If the cut through the seat can possibly be accounted for as the result of the general break-up of the craft as it crashed, (which is doubtful) then how are paint markings on the seat closely resembling the paint markings on the tips of the propeller blades to be explained? And why was the seat three miles from the main wreckage? And why was this the only seat found?[17]

Gates, who had charge of the investigation, was Lockheed's own employee. Lockheed sat with United's representatives throughout the trial. Their experts testified for United. Lockheed is a defendant in another suit originating out of this crash. Gates could have been easily produced as a witness had United wished. He was not. It must be assumed that his theory that the propeller separated and crashed through the fuselage, #4 seat and possibly on down into the #5 belly tank is entitled to substantial weight. Certainly, United did not attempt to discredit Gates directly. Nor did United attempt directly to discredit the assumptions of its own employees, Hupp and Metty, that there was a decoupling of #2 engine. And there was general agreement among the experts that an engine fire is a likely result of a prolonged overspeed and decoupling. (RP 1825; 2929.) This is also borne out by the Appendix. Moreover, a propeller

separation is apt to follow a decoupling. (RP 1806.) The fact that never before had there been a known incident where a propeller separated and crashed into the cabin is completely beside the point. The Memphis incident speaks eloquently of the close call in that case and the tragedy which might have happened there had the propeller flown sideways instead of upwards.

## ANALYSIS OF UNITED'S EVIDENCE

Aside from its contention that libellants failed to prove their case by a preponderance of the evidence, United advances one additional negative reason why the accident could not have happened as libellants contend and one affirmative theory as to how the accident might have happened in a manner wholly different from libellants' theory.

First, United points to the Lockheed experiment in fuel dumping together with certain wind tunnel tests conducted by the Lockheed expert, Dr. McLennan (LX 21; LX 28), and argues that since at speeds in excess of 120 MPH nothing but a continuous, internal ignition source will ignite gas plumes while being dumped, and since there is no evidence of such a continuous source, the accident could not have happened as libellants suggest.

Secondly, United lays great emphasis on the fact that the crew of the Coast Guard plane saw a blue fire on the right side of AMS just before she became engulfed in the orange flames, indicating that the ignition source could not have been from fire in the #2 engine as libellants argue. While there is no certainty as to what the source of this fire was, according to United it not only was on the side of the plane away from #2 engine but, moreover, the color of the flame strongly suggests that it was a fire inside the starboard wing caused probably by the leakage of gas into the wing from

---

17. Again, as always, we are led back to the fact that the seat and bodies were three miles from the scene of the main wreckage indicating they had been ejected from the cabin earlier and precluding the idea that the cut in the seat resulted from the crash into the sea.

a faulty dump chute. Somehow, United contends, this gas became ignited, setting fire to the wing internally. Gradually, it is argued, this fire burned through the wing, exploded outside and into the plumes of gas coming from the starboard dump chutes igniting them, blowing off the right wing and setting the entire plane on fire.

In an effort to explain the loss of AMS, Lockheed, the manufacturer of the plane, conducted exhaustive tests. It sent a plane aloft with wing tanks loaded with colored water in order to see if any portions of the plane were drenched with gasoline during the dumping process. Cameras were mounted at various points on the plane. At about 9000 ft., the dump chutes were opened, the plumes of colored water streaming out behind the plane clearly could be seen, and the plane was put through various maneuvers in order to determine the amount of impingement of fluid upon the frame of the plane. The plane was carefully examined upon landing and the amount of impingement was demonstrated to have been negligible. Then Dr. McLennan mounted a model airplane wing in a wind tunnel and conducted exhaustive tests under conditions simulating fuel dumping in the air. In these tests, gasoline was sprayed out behind the model wing just as in a normal gas dumping operation and a source of ignition was supplied by an electric spark which could be turned on by pressing a button. At speeds in excess of 120 MPH, continuous releases of spark would momentarily ignite the gas plume quite violently. Nevertheless, the fire would not creep back up the slipstream to the wing and, moveover, the speed of the wind rushing over the wing would, after a brief interval, extinguish the flame. Dr. McLennan also conducted a test with an internal wing fire which did result in maintaining a fire on the wing surface. His final conclusions were:

a. "With normal dumping configurations, external ignition of the fuel, creating flames attached to the wing cannot occur at speeds in excess of 100 m. p. h."

b. "With abnormal configurations, it is not considered possible to have fire attached to the wing at air speeds of 120 m. p. h. with an external ignition source."

c. "External fire attached to the airplane at normal flying speeds can only result from an internal fire providing a continuous ignition source."

Thus, United reasons, there being no visible source of continuous ignition on the portside, AMS could not have been destroyed as libellants theorize. But United fails to rule out the probable existence of a fire in the motor as supplying a continuous source of internal ignition. Specifically, if the propeller separated, the likelihood of a magnesium fire bursting out on the nose cone and the flames being instantly swept back over the wing into the dump plumes and igniting them was conceded by Dr. McLennan as a kind of source of continuous ignition which could have caused this fire (RP 3621; 3622). Dr. McLennan also conceded that at the speed AMS was traveling, flames bursting out on the nose cone could be swept back into the dump plume in a fraction of a second. Thus, contrary to what United argues, a fire inside the #2 engine could have been, and probably was, the source of ignition for the orange fire that engulfed AMS.

We come now to the blue fire noticed by the crew of the Coast Guard plane just before AMS burst into a ball of orange fire. This is perhaps the most mysterious phase of the case. Three members of the crew, intelligent, conscientious witnesses, testified that a few seconds before AMS burst into a ball of fire, an intense blue-white flame was seen on the right side of AMS silhouetting the fuselage, extending over and below the fuselage and back as far as the empennage. So certain were the witnesses that AMS was on fire before the appearance of the orange ball of fire

that Commander Hancox radioed to AMS, but before the message could be completed, AMS was a mass of orange flame. United claims this fire originated in the right wing from fuel leaking from a faulty dump chute and was ignited by some unknown source. It possibly could have been. If so, according to Dr. McLennan, an internal wing fire could furnish the source of continuous ignition to ignite the dump plumes. With such an internal wing fire, also, Dr. McLennan testified, the flame might be blue. Moreover, if there was a fire and explosion in the right wing, the wing might have blown off thus causing the sudden turn to the right noticed by all observers. Indeed, Commander Hancox gave an opinion that the accident was caused in some such manner.[18] And his radar operator noticed the splitting of a part, which may have been the right wing, away from the main part of the plane on his radar screen at the approximate moment the ball of fire engulfed AMS.

While superficially persuasive, this theory of the happening of this accident does not stand closer examination. As to the blue fire, the crew did insist they were not mistaken. However, they admitted the possibility of error and conceded that the only means definitely to verify or reject their impression of fire was for Lockheed to conduct a further fuel dumping experiment at night by moonlight. Unfortunately, this was never done. An experiment conducted by libellants' counsel in Court with a model plane demonstrated how the crew might have been misled into thinking the blue light was confined to the right side of the plane alone. Of great importance is the testimony of Captain Fisher, who had an equally good view looking directly at AMS. Just after AMS received permission to dump gas, he saw "a large white puff behind him [AMS] * * *

a steady trail of mist which was coming out in kind of a bubbling, rolling motion beneath the airplane, under the tail section, and extending aft approximately the length of the fuselage * * * with the moon reflecting on it, the mist had a silvery appearance."

There are two immediate reactions to this testimony:

(1) All eye witnesses probably saw exactly the same thing except for the color.

(2) Captain Fisher saw exactly what one would expect to see under those conditions, including the color of the gas plumes.

Moreover, a leak in the right wing due to a faulty dump chute is sheer speculation wholly unsupported by any evidence.[19] There was no known, or strongly suspected, ignition source on the right side of the plane as compared with #2 engine on the left side.

I am reluctantly forced to the conclusion that what the crew of the Coast Guard plane saw was a bright white or silvery mist which by some trick of light had a somewhat bluish appearance. It was not fire but gave the illusion of fire (RP 3632; 3633) because of the luminescence and the billowy or rolling motion of the gas plumes.

Not only can respondent's version of this happening be explained away at least to a considerable extent, but to accept it is wholly to discredit (1) the probable source of ignition being fire in #2 engine in connection with the plumes of raw gas immediately behind; (2) the testimony as to the bodies being those assigned to seat #4 just aft of the #2 propeller; (3) the presence of the two bodies and the seat three miles from the main wreckage; (4) the slashed seat "cut from top to bottom by a downward, angular smashing blow" and (5)

18. His opinion is not entitled to great weight because his qualifications as an expert in this field are considered to have been meager.

19. There was no evidence of improper maintenance of dump chutes or any history given of a faulty design which had in the past resulted in leakage into the wing. There was absolutely no explanation as to how a fire could have developed on the right-hand side of AMS.

"paint marks and spacing of the marks on seat structure [the same seat] visibly similar to the paint banding which is on propellers adjacent to the tip."

Then there is the additional factor favoring libellants' version of the affair that, if the propeller cut down through the seat, and it probably did, it would in all likelihood have cut through the floor and #5 belly tank causing an additional explosion which not only could have furnished the, or one of the, ignition sources for the gas plumes but, at the same time, the force which blew off the wing (if in fact a wing did separate) and ejected the seat and bodies from AMS several miles before it struck the sea.

## CONCLUSIONS ON CAUSATION

■■ No one will ever know with certainty what caused this accident. The plane together with other valuable evidence lies on the bottom of the sea. It is not to the credit of the Venezuelan government that the subsequent inquiry was abruptly terminated, and the reasons why the Civil Aeronautics Board did not continue the investigation, at least to some extent, are not entirely clear. The accident may have been caused by factors altogether different from those argued by either side or it might have happened as United says. However, for libellants to prevail in a case such as this, based largely on circumstantial evidence, they need not eliminate every possible contrary conclusion so long as the record viewed as a whole shows by a preponderance of the evidence that their theory is more than likely correct. Compare United States v. Allard, 240 F.2d 840 (3d Cir., 1957). The most painstaking analysis of the record convinces me, and I so find, that the libellants have demonstrated by a preponderance of the evidence that this accident was the result of a prolonged overspeed and inability to feather the propeller, leading to a decoupling, fire, and a separation of the propeller. Simultaneously, the propeller crashed through the fuselage dislodging the #4 seat, ejecting it and its occupants, and gashed into the #5 belly tank which exploded. The flames from the #2 engine were swept back over the wing directly into the raw plumes of gasoline being dumped from the port dump chutes, igniting them. Also, the flames from the explosion added to and increased the holocaust resulting in the total loss of the plane.

## THE NEGLIGENT CONDUCT

Having found that libellants have established by a preponderance of the evidence that AMS burned and crashed as above described, we now proceed to inquire as to whether the record supports the charges of negligence against United.

The first charge of negligence [20] is that United created an unreasonable risk of harm to Mr. Noel by failing to make available for its propeller systems prior to the accident certain devices that either limit overspeeds or insure feathering when overspeeds occur, in light of United's knowledge of frequent overspeeds and inabilities to feather and the extreme consequences thereof (disintegration, decoupling, separation, and fire). Had United acted promptly and assigned an adequate number of its personnel to the solution of this problem and the manufacture and marketing of such safety devices, libellants assert that this accident would never have happened.

Before analyzing the facts bearing upon this series of charges, it is desirable to fix the proper standard of care to which the manufacturer of component parts of airplanes intended for sale to airplane manufacturers is subjected.

Prosser, Law of Torts, § 33, p. 147 et seq., states the rule to be that the standard of care required is reasonable care, varying with the degree of apparent risk in each case.

"The amount of care demanded by the standard of reasonable conduct

20. Actually, there were two grounds of negligence charged by libellants, but, because of the finding of liability on the first ground, the second charge is not discussed.

must be in proportion to the apparent risk. As the danger becomes greater, the actor [manufacturer] is required to exercise caution commensurate with it. \* \* \* What is required is merely the conduct of the reasonable man of ordinary prudence under the circumstances, and the greater danger \* \* \* is merely one of the circumstances demanding a greater amount of care." See also 2 Harper & James, The Law of Torts, pp. 929–932.

This rule of conduct was incorporated into the body of Admiralty Law in Sieracki v. Seas Shipping Co., 149 F.2d 98 (3d Cir., 1945), aff'd, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099. In that case, the Maritime Commission awarded the contract for the building of a ship to Bethlehem Steel Co. Bethlehem Steel awarded the rigging contract to its subsidiary, Bethlehem Sparrows Point Shipyard, Inc. A part of the rigging subcontract required Bethlehem Sparrows Point to install a ten-ton boom and tackle at No. 5 hatch. The rigging contractor purchased a shackle, a component part of this boom, from an unnamed manufacturer which was not sued. The ship was delivered to Seas Shipping Co., another defendant. The shackle thereafter broke, injuring a longshoreman who was engaged in unloading and who sued Seas Shipping Co. which, in turn, joined the two Bethlehem companies as defendants. Seas Shipping Co. was absolved from negligence but the two Bethlehem companies were held liable.

In this connection, Judge Goodrich speaking for this Circuit said, *inter alia:*

"The Bethlehem Steel Company constructed the ship on contract with the United States Maritime Commission, which in turn sold it to Seas Shipping Co. Bethlehem Sparrows Point Shipyard, Inc. was a subcontractor which installed the defective equipment. As the Court below stated, the case is one of maritime tort. Atlantic Transport Co. of West Virginia v. Imbrovek, 1914,

234 U.S. 52, 34 S.Ct. 733, 58 L.Ed. 1208, 51 L.R.A.,N.S., 1157.

"Nevertheless, the principles in MacPherson v. Buick Motor Co. 1916, 217 N.Y. 382, 111 N.E. 1050, L.R.A.1916F, 696, Ann.Cas.1916C, 440, are broadly applicable, that law having become so widely accepted as to be construed as a part of the general law of torts, maritime as well as common law. They are summed up in Restatement, Torts § 395 as follows:

" 'A manufacturer who fails to exercise reasonable care in the manufacture of a chattel which, unless carefully made, he should recognize as involving an *unreasonable* risk of causing substantial bodily harm to those who lawfully use it for a purpose for which it is manufactured and to those whom the supplier should expect to be in the vicinity of its probable use, is subject to liability for bodily harm caused to them by its lawful use in a manner and for a purpose for which it is manufactured.'

"That the appliance here in question was *one concerning which great precautions were necessary in order to comply with the requirements of reasonable care is clear.* It is found as a fact that the defendants all knew that the shackle in question was to be used to support the ten-ton boom. *The failure of this shackle to support the boom and any load which it might at the time be hoisting would thereby endanger human life* as well as property. It is equally clear that plaintiff was one of the persons within the ambit of the protection of the duty imposed when he was assisting to load the ship. *He was engaged in the very thing for which the apparatus was designed and was one of those 'whom the supplier should expect to be in the vicinity of its probable use* \* \* \*'." (Emphasis supplied.)

In substance, then, the Third Circuit Court agrees with Prosser. What Judge

Goodrich in effect said was that while the conduct of the reasonable man is always the test, nevertheless, the amount of care which a reasonable man must take increases with the foreseeable risk involved to others.

Insofar as concerns this case, United, as the manufacturer of the propeller, is the reasonable man. The important considerations involve (1) the recognizable or foreseeable risk, (2) the degree of danger involved and (3) whether Mr. Noel was within the ambit of the protection of the duty imposed.

As to the first consideration, it has already been established that prior to June 20, 1956, there existed a number of instances of overspeeds accompanied by inability to feather resulting in decoupling, fire, or a propeller separation or a combination of the three.[21] LX 77 and 78 reveal some 79 actual instances of overspeeds of which there were 73 cases of inability to feather. LX 53 demonstrates 8 common types of overspeeds of which, it was conceded by United, in three types the propeller definitely would not feather and in the remaining five, the ability to feather would be marginal. As early as 1950, United was aware of inabilities to feather due to sticking valves in the governor from oil contamination (LX 65). United admitted that the need for an alternative feathering device was known as early as 1954 but LX 133 indicates that United was aware of this fact as early as 1952 and LX 94 would seem to demonstrate as early as 1950. LX 64, dated March, 1954, over two years prior to this acci-

dent, reveals Mr. Pond, a responsible official of United, advising Mr. Thorell of the Woodward Governor Co. (a wholly owned subsidiary) that a plane could be lost as the result of governor failure. Mr. Rhines, United's Assistant Chief Engineer, also admitted this knowledge (RP 2023). Significantly, in LX 94, we see Mr. Borger, Chief Engineer for Pan American saying in exasperation to Mr. Hupp, the United official, "Only after 8 years of overspeeding and inability to feather Hamilton Standard [United] starts to think about changes."

Reluctantly, also, it becomes necessary to analyze a curiously persistent course of conduct on the part of United during the earlier phases of discovery in this case which on the one hand obstructed the obtaining of information (for instance see RP 2696 et seq.; 2732 et seq.) on overspeeds and on the other led to the actual destruction of records which may well have contained relevant information on overspeeds. In 1960, this Court required United to list all malfunctions of its propellers of certain relevant types occurring within specified periods. United filed a motion asking that the order be modified or otherwise it would take six key men one-quarter of their time eight months to gather this information. The Court unfortunately permitted witnesses from United to testify for two full days on this question. It is my present conclusion that much of the testimony heard was misleading with the result that United was granted certain discovery relief to which it was not entitled. Furthermore, during the progress of this very case an undisclosed

---

21. 4/3/47 UAL Fire
7/7/49 PAA–AD Fire separation
8/27/50 PAA–AD Fire
5/23/51 PAA–LAD Fire separation
10/5/52 PAA–PAD Fire
9/6/53 NWA Fire
7/6/54 AA Decoupling
12/31/54 Navy Decoupling, separation
3/26/55 TWA Separation
4/28/55 TWA Decoupling, fire
10/26/55 Air Force Decoupling, separation
10/30/55 EAL Fire
12/26/55 PAA Decoupling
12/28/55 PAA–AD Fire separation

number of the records on overspeeds of the year 1955 were destroyed by United for reasons not deemed satisfactory to this Court. If laymen might not have realized the significance of the destruction of relevant records during the progress of a law suit, United's House Counsel should have.[22] And if the destruction of these records was the result of negligence or oversight, as it, of course, may have been, then United will simply have to abide by the consequences.

Accordingly, I draw the inference that there were many other cases of overspeeds which libellants were unable to discover and put into evidence. See also LX 156 (RP 3001). In addition, while no records of overspeeds and inability to feather among military aircraft were available, it was estimated by United's own witnesses that such failures would at least equal and probably exceed the number of failures among civilian airlines.

■ In all, I have little doubt that libellants have proved by a preponderance of the evidence that United had notice of so many instances of overspeeds where the propeller could not be feathered that the likelihood of the loss of a plane from this occurrence could well have been anticipated.

■ As to the second consideration, the degree of danger involved in such overspeeds and inability to feather, there is no doubt that measured in terms of the potential danger to human life, United was clearly on notice that an inability to feather following an overspeed could lead (a) to a decoupling, (b) fire and (c) propeller separation. These facts have been found. It requires no expert testimony to imagine the terrible consequences of a fire (with or without an accompanying propeller separation) on

an airliner 20,000 ft. in the air. And it is no excuse to argue that never prior to June 20, 1956, had the loss of a plane or a passenger death been attributed to an overspeed and inability to feather. The Appendix discloses at least 9 instances prior to this date where fires resulting from overspeeds and inability to feather caused emergency landings. That no life was lost was sheer luck. Incidentally, the accident here was followed within six months by three other serious incidents although no lives were lost. [6/26/56; 10/16/56; and 12/12/56. LX 78.]

■ As to the third consideration, no time need be wasted in concluding that Mr. Noel, a passenger on AMS, was a person within the ambit of the protection of the duty imposed upon United.

■ From these facts, I conclude that United was obligated to employ a high degree of care and caution in the design and manufacture of its propeller governor and governor systems.

I have found that overspeeds followed by inability to feather were happening with sufficient frequency to serve notice on United that the extreme dangers inherent in these situations placed upon it the duty of using a high degree of care in developing a more dependable propeller system. Moreover, inherent in this was the duty to act with promptness.

Did United meet these obligations in such manner as to absolve itself from all blame? I reluctantly conclude that it did not. This is not to say that United did nothing about the situation. Three approaches to the problem were under relatively continuous experimentation and in a greater or lesser degree of development at the time of this accident. They were Integral Oil Control (I.O.C.),

---

22. No criticism is intended insofar as concerns United's trial counsel, but this Court did not understand then and, after long reflection, cannot understand now how, with interrogatories outstanding asking for lists of overspeeds, United could conscientiously ask for repeated delays in answering these interrogatories until after at least some of the 1955 records as to overspeeds were destroyed. RP 1882–1886 of the record reflect the history of this unfortunate business.

a Separate Feathering Valve and Pitch Lock. A brief description of each follows:

1. *Integral Oil Control*

This was used by the Military as of 1956. It was a design arrangement which collected in one package the various control functions of the governor, including feathering, having its own separate oil supply. It solved the contamination problem associated with using engine oil. (LX 154, P. 1.)

2. *Pitch Lock* .

This is a mechanism which detects when an overspeed has started or is about to start, and prevents the blade angle from going to low pitch by locking oil in front of the piston. Thus, the purpose of this mechanism is to prevent overspeeds from getting too high. Pitch Lock does not prevent overspeeds. It limits them. (Pond 2575.) Desire to develop a pitch lock mechanism dates back to early 1940's. (Rhines 1916, et seq.)

3. *Separate Feathering Valve*

A system whereby auxiliary engine oil used for feathering is routed not through the governor pilot valve (which may be stuck), but through a separate valve that is only used for feathering. This obviates problems that have their source only within the governor itself. Other problems which make feathering impossible are not corrected by a separate feathering valve. Note that engine oil is still used with the separate feathering valve, unlike I.O.C. which has its own oil. (Rhines 1945, et seq.)

I.O.C. seems not to have been the ultimate answer although some units were sold to the Military in 1956, and TWA installed others on some of its planes primarily because of the double acting feature which would permit the propellers to reverse for landings on short fields. But the airlines as a whole showed little interest in it. This may have been for several reasons. It seems to have been (a) too expensive (for instance Pan American refused it for that reason), (b) too heavy, (c) too complicated and badly located (RP 1908). Moreover, although Rhines felt highly of it, the device may not have been as effective as believed because it is significant that while the Civil Aeronautics Authority issued Airworthiness Directives on Pitch Lock and the Separate Feathering Valve, no Directive was issued on I.O.C.

I shall consider the separate feathering valve only briefly by way of illustration as to how slow United's progress was in solving the problems. This is because I was unable to find by a preponderance of the evidence that this accident was caused by governor failure. As previously noted, separate feathering was designed to cure feathering problems which originated in the governor only. It was sufficiently effective that the CAA in 1958 required its installation on all prop planes. While, as stated above, I have not been able to find convincing evidence that the overspeed in this case originated in the governor, nevertheless, referring to the Appendix, it is apparent that at least 27 of the approximate 119 known overspeeds followed by inability to feather originated in governor failures. Grindle, libellants' expert, felt that 90% of all overspeeds originated there. I do not accept this but am of the view that a substantial number of overspeeds originated in the governor due to the blocking of a governor valve from contamination in the hydraulic system. But despite the fact that this contamination problem had been known since 1950 at least, it seems a reasonable assumption from the evidence (RP 2568) that United did not even start to work on the separate feathering valve until after this accident happened on June 20, 1956.

Pitch lock, as mentioned elsewhere, did not accomplish feathering. It limited overspeeds. It was also sufficiently effective to be the subject of a directive from the CAA in 1958. *It had been fully certified by CAA and was in partial operation prior to this accident. It seems to have been particularly effective during cruising where this and most of the*

*other known emergencies happened. Yet, curiously enough, while it seems to have been certified, manufactured and in actual use on the Douglas planes as early as January 1956 (LX 52 and LX 150), it was not available for Constellations. No good reason was shown why not.* (RP 2310–2311.) *Apparently, it could have been developed simultaneously for both Douglas and Lockheed planes.* (Rhines 2161.) *Had pitch lock been installed on AMS, it is more likely than not that it would have survived.*[23] (Pond 2773.) There is no evidence that Lockheed had been offered pitch lock and rejected it. There is no evidence that it was too costly, too heavy or too complicated as in the case of I.O.C. Nor is there any evidence revealing why a vigorous program to remedy these problems begun when they were first recognized as serious would not have resulted in pitch lock being available for all Constellation type planes prior to June, 1956. A peculiarly significant piece of evidence is LX 94, already referred to. There, Mr. Borger, a Chief Pan American Engineer, is quoted by Hupp, a United official, as exclaiming in exasperation in 1957, " * * * only after 8 years of overspeeding and inability to feather Hamilton Standard [United] starts to think about changes." [24]

One answer to the slowness with which United was dealing with the feathering problem including pitch lock may be found in the development of the Lockheed Electra. This plane was equipped with United (Hamilton Standard) propellers and governors upon which the very latest improvements and safety devices including pitch lock were incorporated. In connection therewith, United issued a brochure (LX 84) [25] dated January 1956, six months prior to this accident. Now the unfortunate inference from reading parts of this brochure in connection with its date of issuance is that during an undisclosed portion of the same period while United was so slowly developing pitch lock for use on the existing prop planes, it was devoting a tremendous part of its energies and resources to the completion of a new propeller system containing every known safety device for the Electra which would not receive air clearance from CAA until 1958. The unhappy result was that passengers on Constellations and other planes were in daily danger because some

---

23. Had pitch lock been available and LAV refused to install it on its planes, United's responsibility would have been terminated insofar as this case is concerned.

24. Another illustration of the very deliberate manner in which United was viewing this serious problem is LX 95 (letter from Hupp to Pond) showing 72 incidents of overspeeds between January 1, 1955, and February, 1957. This exhibit discloses that in 9 incidents the propeller was feathered, in 12 it was not, and in 50 it was not known whether feathering was or was not accomplished. We are left with the inference that Hupp had not bothered to write the airlines in question to find out whether or not feathering was accomplished in the remaining 50 incidents. And even when in January, 1958, CAA, somewhat belatedly it would seem, proposed to issue a directive requiring the universal installation of pitch lock by May 1, 1958, United was able to stave off a compliance with this effective date for an entire year upon the excuse of production problems in making

pitch lock kits available. (LX 144.) The fact that United officials had been predicting, and United was gearing itself for, a decline in the propeller market might furnish one reason for the delaying tactics (LX 85).

Also, a careful reading of correspondence between certain Air Line Pilots Association officials (LX 155; LX 156; RP 2925–3004) strongly suggest not only that the frequency of overspeeds and inability to feather were not suspected by the industry as a whole, but also that United acted slowly and the CAA indecisively in remedying the problem.

25. "Furthermore the assembly has been arranged so that safety of flight functions are independent of the aircraft electrical and hydraulic systems, feathering control is divorced from normal constant speed control, hydromechanical mechanism is employed for all basic functions and *a dual control failure philosophy is followed.*" LX 84, P. 3 (Emphasis added.)

unknown and probably substantial portion of United's forces were working on the development of the last word in propellers designed for a plane which would not even go into passenger service for two years in the future.

In view of the high standard of care placed upon United in the manufacture of its propellers, it would be expected by way of defense that there would be fairly convincing evidence both oral and written demonstrating that at some point during the early 1950's United's engineering management, recognizing the danger to human life involved in the inability of its governors to feather during overspeeds, decided upon an accelerated program to produce acceptable alternative safety devices; that engineers, technicians and sufficient funds were made available and the program put in charge of a responsible head with directions to push the program vigorously; that despite the use of all reasonable efforts, nothing more could humanly have been accomplished than was accomplished. Again, it might be thought that evidence would be forthcoming to dissipate the inference that United's efforts put into developing the new propeller system for the Electra in no way detracted from a vigorous program to develop and make available reasonable safety devices for the existing propeller systems. In effect, there was no such evidence. Rather there were two vague and very general statements by Mr. Rhines reciting the history of United's efforts in connection with pitch lock and separate feathering (RP 1953 et seq. and RP 1927 et seq.). Neither of these statements, nor anything else found in the record, demonstrate that United's conduct was commensurate with the high degree of care required under the circumstances of this case.

Assessing United's development program for the correction of overspeeding problems against the background of the standard of care imposed upon it by law, I am forced to the conclusion that United was negligent in that it should and could have produced pitch lock for use on Constellation type planes prior to June 20, 1956, and had it done so, the ability of AMS substantially to control the overspeed would have been materially increased.

■ In so concluding, I have tried to make due allowance for the many vexing and complicated problems with which a big business is faced. I am certain that overspeeds followed by inability to feather were by no means the sole problem remaining to be solved on United's drawing boards. There were, no doubt, many such problems, many development programs, huge government contracts, and a myriad of other details constantly awaiting solution. Above all, there is the stockholder demanding a reasonable return on his money. In addition, it must be freely conceded that United as of 1956 had gone a considerable way towards a reasonable solution of the overspeeding problem in developing pitch lock. Yet, United (or at least its Hamilton Standard Division) is a relatively unique concern, manufacturing as it does, over 90% of all propellers and propeller systems. Having a virtual monopoly, it was in a position, unlike highly competitive industries, to schedule its operations in a manner most favorable to its overall operations program without the threat of losing business. Moreover, whether one likes it or not, hand in hand with the manufacture of airplane propeller systems goes the duty of employing a high degree of care in providing a trouble-free system in order to protect the public from the grave dangers inherent in malfunctions occurring in airliners many thousands of feet high in flight. And in cases such as this, where a recurrently dangerous situation such as inability to feather following overspeeds has only been partially solved, it would seemingly be the duty of the maunfacturer to bring this fact and all its attendant details home, at the very least, to the CAA so that this powerful agency could assess the situation and take proper steps in behalf of the public interest. At any rate, leaving this point aside, if there were extenuating circumstances tending

to excuse United's having pitch lock available for Douglas planes but not Constellations as far back as December 1955, we must assume United's able trial counsel would have called them to the Court's attention.

It would be unfair to say that United did not have the problem of feathering constantly in mind or was doing little or nothing about it. It would be equally unfair to a potential passenger on a Constellation type plane in June, 1956, to say that he was about to board a plane having a propeller system equipped with every safety device which reasonable engineering minds could have devised and had on the market in view of the existing circumstances.

■■■ At the risk of repetition, I cannot avoid the conclusion that had pitch lock been installed on AMS as of June 20, 1956, it is more than likely that it would not have crashed. (Pond 2752; LX 53, P. 3; Grindle RP 699.) It is my conclusion that libellants have adduced evidence which would satisfy an impartial mind that they have met their burden of proving by a preponderance of the evidence that this accident happened just about the way they claim it did and, moreover, that United fell short of meeting the exacting standards of care required under these circumstances.

■■■ The weakness of United's defense was most apparent in two respects: (1) In view of the high standard of care imposed on it in the manufacture of its propellers and propeller systems, the evidence fell substantially short of demonstrating that it had done everything reasonably possible not only to solve the feathering problem but to manufacture and make available for installation safety devices such as pitch lock; [26] and (2) its position that it was libellants' duty to prove its case to a point almost beyond a reasonable doubt. Libellants were under no such obligation. Libellants' duty was much less exacting, being to prove its case by a preponderance of the evidence. According to the great weight of authority, a preponderance of the evidence "* * * means evidence which is of greater weight, or more convincing, than that which is offered in opposition." 32 C.J.S. Evidence § 1021, p. 1051.

■■■ At the risk of some repetition, the defenses of United will be briefly listed and disposed of:

(1) "If a man * * * can make a better mouse trap than his neighbor, though he build his house in the woods, the world will make a beaten path to his door." This quotation is, I take it, a way of saying that since United manufactured and sold virtually 90% of all propellers, its very reputation points to the fact that it builds the finest propellers to the most exacting standards of care. This is a legal non-sequitur. Under facts such as here, it is under a duty to build even a better propeller. Compare Sieracki v. Seas Shipping Co., 149 F.2d 98 (100); Petition of Oscar Tiedemann & Co., 179 F.Supp. 227 (228) (D. Del.1959).

(2) The fact that never before had a plane been lost due to an overspeed and inability to feather. The facts belie this statement. There were nine emergency landings including one crash prior to this accident under circumstances indicating overspeed and inability to feather. (Appendix.) As indicated, that no human life was lost was sheer luck. Moreover, compare Prosser, Law of Torts, Chap. 5, Sec. 30 at P. 122 and Hopkins v. E. I. duPont, etc., [3 Cir.] 199 F.2d 930 (933) from which it might well be concluded that such a defense is not permissible under the facts here in any event.

26. The fact that there were one or more crashes of TWA planes which had pitch lock installed is not attributable to pitch lock. (RP 2752.)

(3) *CAA did not issue an airworthiness directive requiring the installation of pitch lock until May 1959.* This is no defense. Perhaps CAA was also negligent (RP 3001). It seems fairly clear, however, from a reading of the whole record that neither CAA nor Air Line Pilots Association was aware of the number of incidents of overspeeds and inability to feather. Of course, the serious cases could not be concealed because they were newsworthy, but in the bulk of the incidents, United alone together with the airline involved had the information. And there was evidence that when a list of such incidents was asked for by CAA, United furnished a very incomplete list. See LX 107-Carneilla report containing 50% omissions. See also RP 2995–3003.

(4) *One plane on which pitch lock was installed burned and crashed* after June 20, 1956. I do not regard this as a defense. Pitch lock was generally satisfactory and particularly effective while the plane was cruising, at which point the overspeed in this case happened. In the case of properly installed pitch lock, no accident was known to have happened.

(5) *CAA certification of the propeller system as a defense.* The fact that the propeller system on AMS was certified by CAA is certainly evidence in favor of United but it is not controlling. It did not relieve United from the continuing duty to improve its propeller system in view of the factor of human safety involved. If certification were a defense, United need never have attempted to improve its propeller system after the date of certification. United concedes that certification is not binding on the Court but that the circumstances of each case control. It would be futile to defend an auto crash for the defendant to rely on the fact that he had taken a driver's training course and held an operator's license. The defense of certification per se is equally futile.

## DAMAGES

### LIFE EXPECTANCY

At the outset, it is pertinent to say that in cases of this sort damages are a highly speculative item. A man's previous record of good health together with a long life expectancy does not preclude his being killed in an automobile accident the next day, and a high earnings record for the five years previous to his death does not rule out a sharply decreased future income due to unforeseen economic or health conditions. Therefore, it is not proposed to approach the subject of an award of damages here with slide rule precision. O'Toole v. United States, D.C., 140 F.Supp. 672, aff'd, 242 F.2d 308 (3d Cir., 1957).

Initially, it is my general view that much too bright a picture has been painted both of Mr. Noel's life expectancy and economic future.

Six years prior to his death, Mr. Noel weighed 265 lbs. He was about 5' 9" tall. He was fat to the point of obesity. He went to Mayo Clinic about 1949. He was advised to take, or did take, an extended rest of from 4 to 6 months. Presumably, he was in a serious condition. He was a mild diabetic. He gradually reduced his weight to 243 lbs. in 1953. There is hearsay testimony to the effect that at the time of his death his weight was down to 200 lbs. This testimony was given by his wife and was based only on what Noel told her. It is of but the slightest probity.

In addition, Mr. Noel was an extremely energetic and restless man. A close

business associate described him as a "terrifically hard worker." He is pictured as frequently meeting clients coming in for a business appointment at 2:00 and 3:00 o'clock in the morning. It is conceded that overweight plays an important part in longevity. Noel was a combination of a tremendously overweight and tremendously hard-working man. I cannot accept a life expectancy of 25 years in such a case. I adopt a life expectancy of 20 years during which time I conclude he would have worked actively.

## FINANCIAL

Mr. Noel was an excellent salesman, capable of making a large income. In the five years immediately preceding his death, his income ranged from $35,000 to $108,000, as follows:

| | |
|---|---|
| 1951 | $ 35,000 |
| 1952 | 60,000 |
| 1953 | 60,000 |
| 1954 | 85,000 |
| 1955 | 108,000 |

But just prior to his death, he had liquidated his own business for $400,000. He was engaged in a heavily losing business venture in Texas. He was just embarking on a completely new business venture in Venezuela which, at the time of his death, had not begun operations.

Mr. Noel was very obviously a heavy spender. Between 1951 and the date of his death, his luxurious mode of life coupled with heavy business losses exceeded his entire five previous years' earnings by $100,000. While he had discussed the liquidation of the losing Texas venture, we do not know when or at what further loss this would have been accomplished, but it probably would have been deferred as long as possible because the sole purpose of this business was to provide a livelihood for Mr. Noel's father and brother. We do know he was starting a completely new, untried business

venture in Venezuela, a risky sort of enterprise in view of the history of political instability and confiscation of foreign assets common in most South American countries.

In this connection, also, it is to be emphasized that not one iota of evidence was introduced as to the background, capitalization, contracts or prospects, immediate or future, of the Venezuelan venture. The combination of the relatively heavy and continuous losses on the Texas business and the complete absence of any proof as to the probability of success of the Venezuelan venture strongly suggests the unlikelihood of any net income to Mr. Noel for a number of years during which he might have had difficult times and been forced to live on capital. It is entirely within the realm of possibility, and I so find, that it would have taken Mr. Noel five years [27] to establish his Venezuelan business on a profitable basis and at the same time to extricate himself from his financial difficulties in Texas. During this time, he not only would probably have had no net income but, in fact, been compelled to reduce sharply his relatively luxurious manner of living. It is of course unrealistic to predict any exact, annual net income thereafter. However, I find that, in all, for the balance of the 15 years of his life, the total damages, reduced to present worth at 4%, would amount to $387,387.

 Of this sum neither Pat nor Sharon would be legally entitled to anything because of the finding that Mr. Noel would have had no net earnings for 5 years after his death. However, Marsha would have been entitled to 6 years of maintenance and support and, in addition, a college education. I therefore find that, reduced to present worth at 4%, Marsha would be entitled to $30,000.

 Because of his lavish way of life, I cannot conclude that Mr. Noel would have left any substantial estate

27. One could reasonably assume that if, by this time, the Venezuelan enterprise was not successful, Mr. Noel would have abandoned it and devoted his considerable talents to the sale of heavy machinery in this country.

even though in law each daughter as she arrived at the age of 21 would cease to be a dependent. If any estate were left, it would have been bequeathed entirely to Mrs. Noel. I decline to speculate on any decrease in the value of the dollar over future years and I further decline any award to the members of the deceased's family for so-called loss of nurture. I conclude that his wife and daughters would have outlived decedent.

### AWARD

| | |
|---|---|
| Total damages (reduced to present worth at 4%) | $387,387 |
| Patricia | . . . . . . . . . |
| Sharon | . . . . . . . . . |
| Marsha (reduced to present worth at 4%) | $ 30,000 |
| Mrs. Noel—Balance | $357,387 |

This opinion shall constitute the findings of fact and conclusions of law.

### APPENDIX

| Date | Operator | Aircraft | Remarks |
|---|---|---|---|
| 4/ 3/47 | UAL | DC–6 | Engine experienced severe oil leak. Propeller failed to feather and engine oversped to 4000 RPM. Engine caught fire. Extinguished with engine fire extinguisher system. Found blower housing failure and rupture of governor cut out adapter switch gasket. |
| 7/ 7/49 | PAA-AD | B–377 | Oil pressure dropped on No. 1 engine. Oversped to 3000 RPM during attempted feathering and continued to windmill during emergency descent. Nose section caught fire. Nose section and propeller separated from engine. Engine continued to burn until cruising altitude was established at 3000′. |
| 1/12/50 | TWA | DC–3 | Loss engine oil pressure, unable to feather. Complete engine wrap and propeller shaft failure. |
| 2/ 2/50 | NWA | B–377 | Unable to control or feather propeller due to overspeeding. Engine nose section failure. |
| 3/17/50 | AOA | B–377 | Torque pressure dropped to zero. Engine oversped to 3000 RPM. Replace nose section. |
| 4/23/50 | NWA | B–377 | Propeller ran away in climb, unable to feather. Engine failure, cause of overspeed unknown. |
| 6/21/50 | UAL | B–377 | Engine oversped on climb out. Poor brush block contact pins. |
| 8/27/50 | PAA-PAD | DC–4 | Loss oil quantity and engine oversped, unable to feather. Engine caught fire. Nose section failure. |

| Date | Operator | Aircraft | Remarks |
|---|---|---|---|
| 10/16/50 | NWA | B–377 | Propeller ran away, could not be controlled or feathered. Complete engine "wrap" up. |
| 2/ 9/51 | PAA-AD | B–377 | Oil quantity dropped and engine oversped to 2500 RPM. Unable to feather, cause unknown. |
| 5/ 6/51 | UAL | C–54 | Engine oversped to 3100 RPM, unable to feather. Cause unknown. |
| 5/23/51 | PAA-LAD | L–049 | Engine malfunctioned. Unable to feather. Engine caught fire and fell from aircraft. Nacelle continued to burn until after emergency landing. |
| 11/14/51 | TWA | L–749A | Engine failure, unable to feather. Metal from engine failure contaminated governor. |
| 11/15/51 | AA | CV–240 | Engine oversped to 2800 RPM in cruise, unable to feather. Governor failure. |
| 12/ 7/51 | NAL | DC–4 | Engine oversped to 3500 RPM, unable to feather. Cause undetermined. |
| 1/ 4/52 | CAI | DC–3 | Engine rough, unable to feather. Inability to feather unknown. Engine impeller failure. |
| 2/29/52 | NAL | DC–4 | Engine oversped to 3500 RPM in cruise. Propeller controls ineffective. Propeller distributer valve malfunction. |
| 3/ 5/52 | TWA | L–749A | Engine oversped during cruise, unable to control propeller. Finally feathered propeller after 30 minutes of intermittent feather pump operation, cause unknown. |
| 3/14/52 | AA | DC–6 | Engine oversped to 3800 RPM, unable to feather. Governor internal failure. |
| 5/10/52 | CAP | L–049 | Engine oversped to 3000 RPM, unable to feather. Propeller governor gasket failure. |
| 5/12/52 | EAL | L–1049 | Engine seized in flight, unable to feather. Propeller governor contaminated with metal. |
| 5/14/52 | DAL | DC–4 | Engine oversped, unable to feather. Engine power section failure, cause of overspeed unknown. |

| Date | Operator | Aircraft | Remarks |
|---|---|---|---|
| 7/19/52 | TWA | L–049 | Engine oversped in cruise, unable to feather. Engine failure, intermediate cam drive gear failure. |
| 8/16/52 | TWA | L–749A | Engine oversped, unable to control or feather propeller. Oil supply adapter failure, metal in governor. |
| 9/12/52 | PAA-LAD | DC–4 | Unable to feather propeller after oil temperature rose. Propeller dome excessively sludged. |
| 10/ 5/52 | PAA-PAD | B–377 | Engine lost power in cruise. Engine oversped to 5000 RPM and could not be feathered and windmilled at high RPM. During descent fire broke out around nose section and was not extinguished until aircraft completed emergency landing. |
| 10/ 8/52 | PAA-LAD | L–049 | Engine rough and unable to feather propeller due to excessive sludge in dome. |
| 10/16/52 | NWA | DC–4 | Engine lost oil pressure. Oversped to 3000 RPM, unable to feather. Cause of malfunction unknown. |
| 10/17/52 | TWA | L–749 | Engine oversped to 3000 RPM, unable to feather. Propeller distributor valve malfunction. |
| 10/21/52 | CAI | DC–4 | High oil consumption, unable to feather propeller. Cause of malfunction unknown. |
| 10/30/52 | CAP | L–049 | Nose oil pressure dropped. Propeller oversped, unable to feather. Second order balancer bushing failure. |
| 12/11/52 | BNF | DC–4 | Engine oversped to 2500 RPM in cruise, unable to feather. Metal contamination of governor. |
| 2/ 2/53 | PAA-PAD | DC–4 | Engine oversped to 3200·RPM in cruise, unable to feather. Ruptured oil cooler and propeller dome sludged. |
| 2/ 3/53 | BNF | DC–6 | Engine oversped to 2950 on take-off, unable to control below 2600 RPM, engine failure. |

| Date | Operator | Aircraft | Remarks |
|---|---|---|---|
| 2/10/53 | AA | DC–6 | Engine oversped to 4000 RPM, unable to feather. Propeller governor drive gear failure. |
| 2/19/53 | CAI | DC–4 | Propeller ran away. Engine seized, unable to feather. Reduction pinion gear and bearing failure. |
| 2/20/53 | HAT | DC–4 | Engine oversped to 3000 RPM in cruise, unable to feather. Engine failure, cause of overspeed unknown. |
| 3/14/53 | NAL | L–18 | Unable to control RPM in cruise, unable to feather. Nose section failure. |
| 4/12/53 | CAP | C–54 | Oil pressure dropped to zero, unable to feather. Crankshaft failure. Cause of failure to feather unknown. |
| 4/14/53 | Slick | DC–6A | Engine oversped to 3000, unable to feather. Governor loose on case. |
| 6/ 1/53 | UAL | DC–6B | Engine oversped to 3800 RPM, unable to feather. Engine seized. Cause of overspeed unknown. |
| 7/ 2/53 | TWA | C–54 | Engine oversped during climb, unable to control or feather propeller. Oil transfer sleeve failure. |
| 7/ 4/53 | NWA | C–54 | Engine oversped to 2800 RPM in cruise, unable to feather. Propeller governor control shaft, P/N 53345W. |
| 9/ 6/53 | NWA | L–1049 | No. 3 engine oversped on takeoff. Unable to control or feather propeller. No. 4 engine lost oil quantity and propeller feathered. No. 3 propeller continued to windmill. Aircraft crashed and burned during emergency landing. No. 3 propeller governor contaminated due to failure of propeller shaft oil seal adapter. |
| 10/ 2/53 | AA | DC–6 | Engine oversped during cruise, unable to feather. Propeller governor failure. |
| 7/ 3/54 | TWA | L–749A | Engine overspeed to 3000 RPM in climb, unable to feather. Propeller control oil supply adapter P/N135974N–1 failure. |

| Date | Operator | Aircraft | Remarks |
|---|---|---|---|
| 8/13/54 | UAL | DC–6 | Engine oversped to 3100 RPM, unable to reduce RPM or feather. Emergency landing. Cause of overspeed undetermined. |
| 11/ 8/54 | AA | DC–7 | Engine oversped to 3700 RPM in cruise, unable to feather. Metal contamination of propeller governor. |
| 11/20/54 | Currey | C–54 | Engine oversped, unable to feather. Engine nose section failure. Governor oil transfer pipe broken. |
| 12/30/54 | AA | DC–7 | Engine oversped to 3200 RPM during climb, unable to feather. Propeller oil transfer tube retaining cap failure. |
| 12/31/54 | Navy | R7V–1 (Constellation) | Overspeed to 3900 RPM, inability to feather, decoupling, propeller separated from the aircraft. |
| 1/ 2/55 | AA | CV–240 | Emergency landing due to oil pressure failure. Unable to feather. No. 8 cylinder off pad. Feathering line ruptured. |
| 3/20/55 | DAL | CV–340 | Oil leak on engine, unable to feather. No. 8 cylinder off pad. Feathering line ruptured. |
| 3/26/55 | TWA | M–404 | Engine rough. Unable to feather. Made emergency landing. Propeller fell off engine during landing. Error in engine assembly resulted in propeller shaft failure. |
| 4/ 2/55 | EAL | L–749 | Engine oversped, unable to feather. Engine experienced sudden stoppage. Engine governor shaft sheared. |
| 4/28/55 | TWA | L–749 | Engine failed in flight. Unable to feather propeller. Engine seized followed by fire. Propeller continued to windmill. Fire extinguished. Aircraft made emergency landing. |
| 6/ 6/55 | NWA | B–377 | Engine oversped to 3500 RPM in cruise. Unable to feather. Propeller windmilled until it seized. Emergency landing. Governor contaminated with metal. |

| Date | Operator | Aircraft | Remarks |
|---|---|---|---|
| 8/16/55 | PAA-LAD | L–1049 | Engine oversped on take off to 3400 RPM, unable to feather. Metal contamination in governor. |
| 10/ 5/55 | PAA-LAD | DC–4 | Engine oversped during climb, unable to feather until airspeed was reduced. Momentary contamination of governor cause of malfunctioning. |
| 10/ 7/55 | PAA-AD | DC–7B | Engine oversped to 4000 RPM during climb. Unable to feather until airspeed reduced to 150K. Governor drive shaft failure. |
| 10/18/55 | EAL | DC–7B | Overspeed and unable to control RPM. Found piece of metal holding low pressure relief valve partially open. |
| 10/20/55 | NAL | DC–7B | RPM went to 3250 on take off. Hinge pin in flyball head broken. |
| 10/26/55 | Air Force | L–1049C | Overspeed, inability to feather, propeller separated. |
| 10/30/55 | EAL | DC–7B | Engine oversped to 3500 RPM in cruise. Unable to feather. Engine impeller exploded during overspeed followed by intense fire. Propeller continued to windmill. Propeller governor shaft failure. |
| 10/30/55 | PAG | DC–7B | Engine oversped in cruise, unable to feather until airspeed was reduced. Governor drive shaft failure. |
| 11/17/55 | AA | CV–240 | Engine experienced oil leak, unable to feather. No. 8 cylinder off pad. Propeller feathering line "B" nut pulled loose at diaphragm. |
| 12/25/55 | PAA-AD | DC–7B | Engine overspeed to 3200 RPM, unable to control or feather propeller. Engine seized. Propeller windmilled independent of engine. Propeller governor drive shaft failure. |
| 12/28/55 | PAA-AD | DC–7B | Engine oversped to 3200 RPM. Unable to control or feather propeller. Engine caught fire and finally fell from aircraft during emergency descent. Propeller drive shaft failure. |

| Date | Operator | Aircraft | Remarks |
|------|----------|----------|---------|
| 1/19/56 | CEA | C–54 | Engine overspeed to 2800 RPM in cruise, unable to feather due to defective oil transfer pipe in nose section. |
| 2/25/56 | PAA-AD | B–377 | Engine rough in climb. Overspeed to 3000 RPM. Engine failure due to "B" row master rod failure. Failure to feather due to damaged feathering line. |
| 2/25/56 | TWA | L–749A | Overspeed and unable to feather. Engine failed. Loss of propeller control probably associated with engine failure. |
| 2/28/56 | TWA | L–1049 | Upon breaking ground, Nos. 3 and 4 engines oversped to 3000 RPM. Feathered No. 4. No. 3 oversped to 3250 RPM. Unfeathered 4 and feathered No. 3. Probably due to seizure of drive gear shaft bushing. |
| 3/ 1/56 | BNF | CV–340 | Engine rough. Unable to feather due to failure of feathering line caused by #8 cylinder lifting of pad. |
| 3/29/56 | NAL | DC–7 | Engine loss power, unable to feather. Engine power loss due to exhaust valve failure. Lack of feathering due to loose wiring. |
| 5/ 1/56 | AAL | DC–6 | Overspeed to 3400 RPM on take off. Could not completely feather, cause not found. |
| 5/ 4/56 | PAA-LAD | DC–4 | Engine rough in cruise. Unable to feather engine. Overspeed due to crankshaft hub failure. |
| 5/29/56 | EAL | L–1049C | Engine turned 3300 RPM on take off roll. Metal chips in governor base and low pressure relief valve. |
| 6/ 7/56 | AAL | DC–6 | Overspeed to 3300 RPM during approach. Partially feathered. Two pieces of safety wire found in governor. |
| 6/ 8/56 | TWA | L–1049G | Overspeed to 3300 RPM on take off and unable to feather. Two idler gear teeth indented and circular impression on pressure side of gear pocket. |

| Date | Operator | Aircraft | Remarks |
|---|---|---|---|
| 6/12/56 | AAL | DC–6B | Overspeed to 3250 RPM during take off. Oil transfer pipe in engine found installed upside down. |
| 6/26/56 | NAL | DC–7 | Engine oversped to 4500 RPM. Unable to feather. Emergency landing. Engine failure and contamination of governor. Propeller blades found in reverse pitch range. |
| 7/ 4/56 | PAA-LAD | DC–6B | Engine overspeed 3200 RPM, unable to feather. Oil transfer housing P/N 77828 failure. |
| 8/11/56 | EAL | L–1049C | Overspeed on take off to 3300 RPM. Small piece of metal found under solenoid valve ball. |
| 10/12/56 | TWA | L–1049 | Oil temperature rose, pressure fluctuated, unable to feather. Governor contaminated. Oil transfer bearing mutilated. |
| 10/16/56 | PAA-PAD | B–377 | No. 1 engine oversped to 2900 RPM in cruise. Unable to feather. Engine seized. Propeller continued to windmill. No. 4 engine lost power during 3 engine flight, necessary to feather propeller. Aircraft ditched. |
| 10/17/56 | AAL | DC–7B | Overspeed to 3500 during climb. Believe momentary loss of high pressure oil to propeller the cause. |
| 11/18/56 | UAL | DC–6B | Engine overspeed to 3600 RPM. Unable to feather. Governor shaft bushing seized to shaft. |
| 12/ 5/56 | DAL | DC–7 | Engine overspeed to 3300 RPM. Unable to feather. Cause of overspeed undetermined. |
| 12/12/56 | A. Sud. Amer. | C–46 | Engine oversped 3500 RPM. Unable to feather. Aircraft ditched and sunk. |
| 12/26/56 | AAL | DC–7 | Aircraft returned to Los Angeles account overspeed to 3400 RPM on take off. Broken piston "O" ring seal found. |
| 12/28/56 | TWA | L–1049G | Overspeed to 3350 RPM during take off following propeller change. Unable to feather. Oil transfer tube in dome displaced because of mishandling. |

| Date | Operator | Aircraft | Remarks |
|---|---|---|---|
| 12/28/56 | PAA-PAD | DC–7C | Engine overspeed to 3200 RPM and could not be feathered. Pitch lock equipped. Found metal in governor. |
| 1/22/57 | DAL | DC–7 | Engine lost power in cruise. Unable to control or feather propeller. Engine seizure and failure of propeller shaft. |
| 1/31/57 | AAL | DC–7 | During climb, Flt. 705, out of Boston, experienced overspeed to 3300 RPM. Propeller feathered. Overspeed probably caused by contaminated oil. Wiping cloth found in power section of engine. |
| 2/ 6/57 | DAL | DC–7 | During climb following take off, engine overspeed to 3300 occurred. Unable to feather. Cause not determined. |
| 2/ 7/57 | LAI | DC–6B | Overspeed to 3300 RPM during test flight while in cruise at 14,-000'. The overspeed was caused by a governor drive failure in the engine. |
| 2/11/57 | DAL | DC–7 | Engine overspeed to 3300 RPM shortly after take off. Partial feathering accomplished. Governor contained metal particles. Low pressure relief valve showed scoring. |
| 2/15/57 | PAA-PAD | B–377 | Engine oversped to 3100 RPM in cruise. Unable to feather. Propeller controlled by throttle. Oil transfer bearing sleeve failure. |
| 3/ 5/57 | AA | DC–7 | Engine oversped to 4500 RPM. Before feathering could be accomplished propeller and nose section separated from engine and struck fuselage. |
| 3/ 7/57 | EAL | M–404 | Engine overspeed to 3000 RPM in cruise. Unable to feather. Emergency landing made. Propeller governor contaminated with metal. Oil transfer pipe, P/N 58127 broken. |

| Date | Operator | Aircraft | Remarks |
|------|----------|----------|---------|
| 3/11/57 | PAA-AD | DC–7C | Engine overspeed to 3200 RPM in cruise. Unable to feather. Engine seized. Metal from failed engine contaminated governor causing failure of governor drive shaft. |
| 3/21/57 | UAL | DC–7 | Engine overspeed to 4500 RPM. Unable to feather until aircraft slowed to 125K. Governor disengaged from engine drive. |
| 3/22/57 | LAC | L1649A | Aircraft #1005 experienced overspeed to 3000 RPM during take off. Unable to feather. Transfer housing gasket .0025 thin approximately 25% of diameter. |
| 3/23/57 | EAL | DC–7B | Unable to control propeller. Unable to feather. Dome piston seal, P/N 69737D–75, broken. |
| 3/31/57 | PAWA-PAD | B–377 | En route Seattle to Fairbanks, engine oversped due to failure of three governor hold down studs. Pitch lock functioned and limited overspeed to 3100 RPM. |
| 4/ 1/57 | PAA-PAD | B–377 | Engine overspeed to 3100 RPM in cruise. Pitch lock held at 3100 RPM. Unable to feather. Found governor pad studs broken. |
| 4/17/57 | Air France | L–1049G | Experienced overspeed to 3400 RPM and inability to feather. Reason for overspeed not given. |
| 4/20/57 | PAA-AD | B–377 | Engine overspeed to 2700 RPM in climb. Pitch lock held at 3500 RPM after reducing power. Unable to feather. Metal particles found in engine screen. |
| 4/24/57 | LAC | L–1649 | Engine oversped to 3200 RPM and was uncontrollable. After airspeed reduced to 110 knots, feathering slowly accomplished. During test of governor, two metal chips were dislodged following which governor was satisfactory. |
| 4/24/57 | NWA | DC–6B | Engine overspeed after take off. Unable to feather. Found governor hold down studs broken. |
| 4/29/57 | CAP | C–54 | Engine oversped, propeller not feathered. |

| Date | Operator | Aircraft | Remarks |
|------|----------|----------|---------|
| 5/23/57 | Swissair | DC–7C | Engine oversped during cruise. Propeller went into reverse pitch during attempted feathering and windmilled. Unable to maintain cruising altitude. Descended to 9000. Emergency landing at Boston. Propeller governor contaminated with metal. |
| 6/ 4/57 | PAA-PAD | B–377 | Engine overspeed. Unable to feather. |
| 6/ 8/57 | EAL | DC–7B | Engine oversped in excess of 3200 RPM during cruise. Unable to feather. Overspeed followed by severe fire which damaged wing structure. |
| 8/18/57 | Vareg | L–1049G | Overspeed to 3500 RPM, inability to feather. #4 propeller separated and struck the #3 propeller. |
| 9/15/57 | Air France | L–1049G | Overspeed to 3500 RPM. Unable to feather. Flames shot 5 feet aft of the wing. Struck low pressure relief valve. |
| 10/29/57 | SAS | DC–7C | Overspeed to 4000 RPM. Unable to feather. Prop separated and dropped into the sea. Separation accompanied by sparks and flames. Caused by contamination, pilot valve seizure. |
| 8/25/58 | TWA | L–1649A | Overspeed to 3600 RPM. Prop separated and went forward, down, and to the right. Plane landed on fire. |
| 9/19/59 | Air France | L–1049G | Overspeed to 3000 RPM (no pitch lock). Unable to feather. Prop separated, struck fuselage, and became embedded between No. 3 nacelle and fuselage. |