**NORTH AMERICAN AVIATION, Inc., a corporation, Appellant,**

v.

**Wanda Lee HUGHES and Randall L. Hughes, a Minor, by His Guardian Ad Litem, Harry Sutton, Appellees.**

No. 15292.

United States Court of Appeals Ninth Circuit.

Aug. 9, 1957.

Rehearing Denied Sept. 25, 1957.

Crider, Tilson & Ruppe, Henry E. Kappler, Los Angeles, Cal., for appellant.

Albert Lee Stephens, Jr., James V. Brewer, Los Angeles, Cal., for appellees.

Before ORR, LEMMON and CHAMBERS, Circuit Judges.

LEMMON, Circuit Judge.

Man or machine—

Which was responsible for the jet airplane crash that caused the death of the pilot, whose widow and whose infant son recovered $125,000 from the manufacturer of the machine?

If the man was responsible for the accident, his widow and his son, plaintiffs below and appellees here, cannot recover, and reversal results.

If the machine was defective, the manufacturer—the defendant below and the appellant here—was responsible, and the judgment of damages must be affirmed.

The action was one for wrongful death. The appellant filed a motion for judgment notwithstanding the verdict or for a new trial. The lower court denied both motions, and gave judgment on the verdict. From that judgment the present appeal has been taken.

### 1. The Stipulated Facts

An F–86F aircraft, manufactured by the appellant, and piloted by the decedent, First Lieutenant Fred L. Hughes, crashed at the west end of the Los Angeles International Airport immediately after take-off, at about 3:27 p.m., on December 18, 1953.

This aircraft had been delivered to the United States Air Force, after acceptance by the latter, and Lieutenant Hughes was flying it from the appellant's factory, located at the Airport, to Nellis Air Force Base, Las Vegas, Nevada, when the accident occurred.

The machine was completely demolished and the pilot instantly killed. The plane was airborne before it crashed.

In addition to these stipulated facts, each party argued that there were certain additional facts favorable to their respective contentions. Those additional facts will be stated below, under appropriate headings.

### 2. The Appellant's Version Regarding Certain Additional Facts

The printed transcript of record in this case consists of 885 pages. Obviously, an independent summary of the evidence cannot be attempted here. Accordingly, we give below the parties' respective versions of additional facts not covered by the stipulation, supra. The appellant's version is given first.

The appellant's aircraft was known as the "Jet F–86F." Although there are numerous landing strips at the Airport, where the crash occurred, the particular strip involved here was about 8500 feet long, was paved, and ran in an easterly and westerly direction.

The evidence is uncontradicted that the weather at the time of the accident was poor. Visibility was obscured by reason of a heavy fog bank which was rolling in from west to east. Flight visibility was described as "zero", and "instrument weather" prevailed. The weather was so bad that no "Army Air Force acceptance flights" were performed on the day in question, and some 18 scheduled flights were canceled.

At the time of his death, the pilot was 25 years of age. He had acquired a total flying time of 627 hours and 5 minutes, of which about 279 hours were spent as a student. His total flying time in the jet aircraft was "comparatively slight," and most of his jet plane experience was in visual rather than instrument flying. As of June, 1953, he had only 137 hours of instrument flying.

The Army Air Force issued to its pilots two types of cards: a green card, "which is something like a rank," and requires at least 500 actual instrument flying hours; and a white card, "which permits no element of discretion on the part of the pilot; it merely shows a basic instrument qualification." The decedent never had a green card, although he did possess a white card, which was not current.

The aircraft contained about 1,000,000 parts, and was capable of exceeding the speed of sound, 735 miles per hour. A jet aircraft requires no warm-up as do other planes when the flight is conducted under visual rules. When, however, the flight is to be on instruments, the motor must be warmed up for at least five minutes, to stabilize certain instruments.

Thousands of these planes had been delivered, and there was no evidence that any of them had ever had any trouble.

Throughout the course of the manufacture of the plane it is minutely checked and inspected in all of its various systems. On the first flight it was discovered that there were three minor "squawks," none of which had anything to do with the take-off or operation at low speeds. Take-off speed was only 110

knots an hour. All the "squawks" were inspected and checked off or corrected.

Although the pilot who flew the Army Air Force acceptance flight was an employee of the appellant, this method of operation had long been in existence between the appellant and the Government.

In addition to the appellant's inspectors, the Army Air Force also has inspectors of its own, who make certain independent inspections. Altogether, there were three inspections by the appellant's flight inspector.

The fatal flight was scheduled for instrument take-off, and the decedent had filed a flight plan with the tower. He was seen to inspect the plane, climb into the cockpit, start the motor, and taxi the machine to the east end of the runway. There is considerable smoke connected with a jet plane. The pilot stopped the machine there for a very short time, probably less than a minute. He then took off, as the fog bank was moving in and covering the west end of the runway.

The take-off appeared to be normal. One witness described the plane's height as 5 to 25 feet at the moment that it disappeared into the fog bank. At a point about 125 feet west of the west end of the runway, the jet crashed to the ground. A fire developed at that point immediately, and spread westerly across Lincoln Boulevard, burning the grass and dirt, and then searing the asphalt surface of the highway. After crashing, the plane proceeded in a westerly direction, tore through the fence on the east side of the Boulevard, went across the highway, broke through the fence on the westerly side of the Boulevard, and proceeded about 200 feet into a vacant field, where the major portions of the plane-fuselage, door assembly, engine, and other larger parts—were found. At the moment that the plane struck the ground there was an explosion, followed immediately by a fire.

William L. Pitts, procurement quality control inspector of the Air Force, immediately took over to "protect the interests of the Government." A team of experts from the appellant, the Army Air Force, and General Electric co-ordinated their activities in an effort to determine the cause, if possible, of the crash.

The appellant produced all of the available experts who participated in the investigation of the accident. They agreed that it was not due to any failure of the aircraft "or its component parts."

The evidence that "pilot error," negligent or *non-negligent*, could cause the jet plane to crash. The appellant lists nine [causative?] "factors" that it says appear in the evidence, including the fact that the pilot was a relatively inexperienced man in the flying of jet aircraft.

3. *The Appellee's Version of Certain Additional Facts*

The pilot was a veteran of 100 combat missions flown in jet aircraft in a foreign theater. He flew 144 hours combat time. Among his decorations were the Distinguished Flying Cross and Oak Leaf Clusters.

His experience included combat in a F–86F airplane, the same type of machine in which he was killed. He had been qualified for instrument flight for three years, and had been an instructor in instrument flying.

From April 19, 1953, to May, 1953, he was suspended from flying for unspecified physical reasons. Such suspension may result because the flier has developed a common cold.

The weather conditions were normal for the Los Angeles International Airport. Visibility was officially fixed at one-half mile. The air traffic moved all afternoon both before and after the accident without interruption. Hundreds of planes of every type, including military, private, and commercial, came and went on schedule. The only flights canceled because of weather were the test flights of new military aircraft manufactured by the appellant, because of an Air Force regulation prohibiting test flights unless visibility is three miles or more.

Neither the instruments nor the jet engine needed to be warmed up. Some of the witnesses used the expression "five-minute warm-up" in connection with an instrument flight, but the matter was clarified by the appellant's own chief production test pilot, whose testimony indicated that the warmth of the engine has nothing to do with the matter, since the instrument in question is the vertical gyro horizon, which is operated electrically and is not dependent upon the operation of the engine. It takes five minutes for gyros "to come to speed."

The plane was in the exclusive possession and control of the appellant until Lieutenant Hughes stepped into the cockpit.

There was evidence of carelessness in the process of manufacturing and inspecting the airplane.

The take-off was normal and at full power, and the plane was last seen in an attitude of climb.

There is evidence that there were a "flame-out", an explosion in the air, a fire in the air, and then a crash.

The opinions of the experts, to the effect that the crash was not due to any defect in the aircraft, "had no affirmative foundation, but were based upon a failure to find evidence of mechanical failure."

### 4. The Questions Presented

The appellant sets out four Specifications of Error, which may be summarized as follows:

1. The evidence did not support the judgment;

2. There was no evidence of appellant's actionable negligence;

3. There was no evidence that any negligence of the appellant was the proximate cause of death;

4. The trial court erred in denying the appellant's motions for judgment n. o. v.

The appellee, on the other hand, states —and we believe correctly—that "In reality there is only one question which is whether there is evidence to sustain the verdict of the jury."

### 5. Summary of the Appellant's Argument

The evidence fails to establish any "actionable negligence" on the appellant's part.

Although the appellees contend that the appellant was guilty of negligence in designing, manufacturing, "fabricating," and servicing the jet aircraft, they produced "not one scintilla" of evidence that there was any defect in this particular aircraft, or that there had ever been any defect or defects in any other machine of similar type manufactured by the appellant, which would indicate negligence in design or fabrication.

Though conflicting in minor points, the testimony "demonstrated" that a plane used by the Army for many years and manufactured by the appellant, crashed while being operated by a "relatively inexperienced" jet pilot "having no connection with appellant."

The weather was "bad" and "foggy," "and was admittedly instrument weather." The pilot had no current instrument standing, although he was presumably attempting to fly with instruments.

It is only by resort to the doctrine of res ipsa loquitur that the verdict and judgment can be upheld, despite the fact that the trial court properly refused to apply that doctrine.

### 6. Summary of the Appellees' Argument

A conflict appears at almost every point that the appellant's brief has treated as material. In each instance it must be assumed that the version favoring the verdict is the true one.

Foamite was found on part of the electrical system as the plane neared final assemby, indicating a fire. The parts affected by the fire were not replaced or inspected for damage after the fire. This is indicated by the presence of the foamite, "and that the only thing required by the inspector was to clean it off."

Here is one of the ways in which the jury might have considered the evidence to reach its verdict:

After take-off, the plane was airborne with wheels and flaps up and doors closed over the wheel wells. It was in an attitude of climb, but not climbing very fast. "This suggests trouble." A possible and perhaps likely source of the trouble is a broken or leaking fuel line.

The pilot may have had trouble with the flight control system, and recognizing a loss of power, sought to switch to the emergency system. Before this could be accomplished, the leaking fuel may have been ignited by a spark from the defective wiring or otherwise.

The pilot then "undoubtedly" lost control, probably because of an "explosion into the cockpit," and possibly because of the loss of the electrical hydraulic system, or both, and a crash followed.

*The evidence is clearly indicative of mechanical failure, which the circumstances indicate is the fault of the manufacturer.* Negligence in manufacture and inspection is evidenced by the signs pointing to a fire in the fuselage during fabrication. There being no evidence that the cause was discovered or rectified or that any effort was made to do so, the possibility of its happening again may be inferred. Such a fire could well be the proximate cause of the accident.

A plume of smoke rose 300 feet in the air—a certain indication of an explosion.

The appellant's supposition that the wing tanks exploded on contact with the ground is not supported by the physical evidence, a large part of which points to mechanical trouble *in the air*.

The jury was well supported by substantial evidence of all types in a conclusion that *mechanical failure* caused the accident—flame-out, explosion, or fire, or all three.

There was no evidence of possible pilot error.

### 7. *Conclusion*

Since, as we have seen, the parties correctly agree that the problem here is factual, we have summarized somewhat fully the respective interpretations of the evidence.

Although the true cause of the accident will probably remain a mystery, there appear substantial evidence to support the appellee's theory that the crash was due to a mechanical defect which developed *while the machine was still in the air;* in other words, a defect in the manufacture of the airplane, for which the appellant was responsible.

Accordingly, the judgment is

Affirmed.